## STATE EX REL. HORACE SHELBY v. DOUGLAS C. RIGG.

### 96 N. W. (2d) 886.

### May 22, 1959—No. 37,711.

*Feinberg, Mirviss, Meyers & Schumacher,* for appellant.

*Miles Lord,* Attorney General, and *Charles E. Houston,* Solicitor General, for respondent as warden of Minnesota State Prison.

NELSON, JUSTICE.

Relator is imprisoned at the Minnesota State Prison at Stillwater, Minnesota, pursuant to sentence of a judge of the district court of Ramsey County. He was arrested in Kansas City, Kansas, on March 24, 1931, where he was held for 6 days. He signed the necessary papers waiving extradition and was returned to St. Paul and arraigned in the District Court of Ramsey County pursuant to an indictment charging him with having committed the crime of murder in the first degree in that he had on October 3, 1921, killed one Thomas Fitzgerald by shooting him with a pistol. Before entering a plea of guilty relator was asked by the presiding judge whether he wished to have an attorney represent him. The transcript taken at the 1931 hearing indicates the following colloquy between court and relator:

"Q. Mr. Shelby would you like to have an attorney appear for you?

"A. I don't think it would be any need, because I am guilty.

"Q. You can have an attorney, or not, just as you like. Do you wish to have a lawyer appear for you?

"A. No sir, I think it will be alright."

The judge who presided and the county attorney who appeared at the hearing are both since deceased.

Relator was born at Pleasant Hill, Missouri, in 1897 and came to Minnesota from Fargo, North Dakota, some 2 years before the commission of the murder. He spent the time in the interim in the cities of Minneapolis and St. Paul. His employment consisted of shoveling cinders in railroad yards. He was so employed when the murder was committed.

Relator left the state the night following the murder and remained away until after his arrest at Kansas City.

His testimony under oath, given after entering a plea of guilty, indicates that he had entered the army during the first world war from Paradise, Montana. He had been drafted and was sent to Camp Lewis. It appears that he had been arrested four or five times, once for breaking into a store, once for carrying a pistol, and once for drawing a pistol while mixed up in a crap game. He was convicted for this last offense February 8, 1922, and sent to prison and served 8½ years of a 21-year term in a Kansas prison. He was paroled at the end of 8½ years but had violated his parole and was sought for his parole violation and also for having shot at a sheriff in Alliance, Nebraska.

The man whom relator murdered was Thomas Fitzgerald, a railroad detective operating in and around the railroad yards and the cinder pit where relator worked in St. Paul. The evidence taken at the hearing indicates that he grew suspicious of Fitzgerald's presence in the yards, his suspicions being grounded on the fact that he knew he was being sought by law enforcement officers in other states. He had jumped registration in 1917 and he was also in difficulty in that respect. He stated that he was apprehensive that Fitzgerald wanted to arrest him for some of his past violations. He admitted that before he shot at Fitzgerald he went home and got a gun; that the killing took place out in the sand house on Jackson Street in St. Paul. The relator's reasons for shooting Fitzgerald may be found in the following questions and answers at the 1931 hearing:

"Q. And where else were you wanted? A. I shot at the Sheriff at Alliance, Nebraska.

"Q. Did you hit him? A. No sir. He shot at me too.

"Q. You were wanted there and did you suspect this man was trying to identify you and bring you back? A. I figured he wanted to arrest me for one of these three things.

"Q. And then what did you do? A. Well the last day you mean what did I do, the day he was standing in the sand house in the door?

\* \* \* \* \*

"Q. \* \* \* A. \* \* \* I kept watching him all the time and he would not put his hands up so I grabbed him and he turned his head like that,

he didn't pay any attention to it. I grabbed him by his right hand with my left hand and he was a taller man that I was. He snatched loose from me and asked what was the matter with me, so I never said nothing right then, we both backed away from each other after he snatched loose from me we both backed off from each other, about the corner of that desk there, both backed away from each other and looked each other square in the eye. I stood there and looked at him and he would not put his hands up and so all of a sudden he pulled his coat back like that and I seen something shining, he had something shining and he was reaching in his hip pocket for his pistol, he reached back for the pistol and that is when I shot him.

"Q. You shot him? A. Yes sir, that is when I shot him. He stood up there and he asked what did I shoot him for, and I told him you know what I shot you for and I stood there but he didn't fall and I shot two or three times, two or three more times.

"Q. After he asked why you shot him? A. Yes.

"Q. Did you keep shooting at him? A. I shot at him two or three times and he stood up there and pretty soon I shot at him again and I think that shot hit him and he fell, he grabbed his side like this and he ran and fell on a pile of sand, and he said 'Lord have mercy' and I walked away, partly running and walking fast up the hill towards Court-land Street and I turned at the top of the hill and walked towards Mississippi Street and down to an empty house down there and hid in that empty house down there that evening and that night and the next night I left and went down in the yards and caught a Milwaukee freight train to Chicago—to La Crosse and from La Crosse to Chicago.

"By Mr. Kinkead:

"Q. Before you shot Mr. Fitzgerald you went home and got a gun, didn't you? A. Yes.

\* \* \* \* \*

"Q. You are out on parole now from the State Penitentiary of Kansas?

"A. Yes sir.

"Q. What was your sentence down there—your total sentence?

"A. Twenty-one years.

\* \* \* \* \*

"The Court: You haven't anything to say why sentence should not be pronounced—are you ready for sentence?

"Defendant: Yes sir I am ready because I know I done wrong, of course I was very near insane at the time I did the deed but I know I should pay for what I done.

"The Court thereupon imposed the following sentence:

"You, Horace Shelby, having plead guilty in open court to the crime of Murder in the First Degree, as charged in the Indictment presented to the Court on the 22nd day of January, 1924, it is adjudged that you are guilty of the crime of Murder in the First Degree, as charged in said indictment, and it is the judgment and sentence of the Court that you be imprisoned in the State Prison at Stillwater, Minnesota, at hard labor, for the term of your natural life."

In 1934 relator was transferred from the State Prison at Stillwater to the hospital for the insane at St. Peter where he was confined until 1954 when he was again returned to the prison pursuant to the sentence under which he had originally been committed.

Relator petitioned the district court of Washington County for a writ of habeas corpus and a writ was issued pursuant thereto. No traverse was made to respondent's return and as a result the truth of the allegations of the return stand admitted. The issues were later tried and findings made holding that respondent's custody of the relator was justified.

On appeal to this court from discharge of writ of habeas corpus trial is de novo and the supreme court will draw its own conclusions from the evidence.

The court hearing the case below found that "Except as the facts herein found are the facts alleged in the petition for the writ of habeas corpus, the allegations of such petition are found to be not true" and concluded that the body of the relator is in the lawful custody of the respondent and that he is to be remanded to continue in the custody of the respondent until he has been thence discharged by due course of law or competent authority, the term of his imprisonment not having expired.

Relator on appeal to this court has presented the following assignments of errors:

"1. Relator was deprived of his rights to due process of law in that he was convicted of the crime of first degree murder without having intelligently waived his right to counsel.

"2. Relator was deprived of his rights to due process of law in that his plea of guilty to the charge of first degree murder was accepted although made by reason of fear and ignorance, and in spite of statements made by him inconsistent therewith."

Questions here involved are whether the relator, under his own admissions and statements disclosed by the transcript of the proceedings before the sentencing court, was deprived of his constitutional rights and the court of its jurisdiction by reason of receiving the relator's voluntary plea of guilty without the representation of counsel but in the face of an outright offer by the court to make counsel available; whether relator voluntarily, understandingly, and intelligently waived his right to have the assistance of counsel in view of what transpired at the hearing or whether relator's plea of guilty was under the circumstances improvidently made and the answers he made to the questions of the court inconsistent with his plea of guilty.

Relator now contends that after his arrest in Kansas City he was brought to St. Paul after signing papers, the contents of which he did not know, and that "being ignorant of his rights, without aid or benefit of counsel, confused, bewildered and in fear, replied, 'Guilty' " when interrogated by the court as to how he wished to plead to the indictment, which had been read to him, charging him with murder in the first degree. Relator's reply, however, of "Guilty" to the court's question was made immediately after the court had advised him that if he wished a lawyer to appear in his behalf he could have an attorney or not, just as he liked, to which he answered in part "I don't think it would be any need, because I am guilty."

In his petition relator alleges that not only did he appear without the aid of counsel, but that he was in fact deprived of counsel, and denied due process of law, because of his own lack of knowledge concerning the rights as an accused coupled with his poverty and inability to hire desirable counsel. Respondent takes the position that the return has met all such allegations by showing the complete transcript of the proceedings upon arraignment and sentence.

Other allegations in the petition of the relator present no claims in fact not hereinbefore mentioned. No traverse of the return having been filed, the court below found that the petitioner admitted the truth of the allegations of the respondent's return and that therefore they are to be taken as true. Occurrences before the indictment are of no interest here since it stands undisputed that the relator was accused by indictment, was duly arraigned, and was convicted upon his own voluntary plea of guilty. The relator, according to the allegations of his petition taken as a whole, appears to rely upon the claim of lack of due process of law in the proceedings which led to his conviction. Mainly, he contends that there was a lack of due process because he did not have the aid and representation of counsel.

The transcript of the hearing before the Ramsey County District Court shows that the accused, under oath, testified concerning his past record and his previous difficulties due to crime as well as the facts surrounding the events alleged in the indictment on the first degree murder charge. His testimony shows that he feared, while working at the railroad yards in St. Paul, that officers were seeking to arrest him because of previous known law violations. Nothing in his testimony shows any justification or excuse for his conduct. His testimony shows that he cruelly shot and murdered Fitzgerald without any justification and without legal provocation. Knowing that he had committed one of the most serious of crimes, he hastened to flee from the state. He knew he was still under the shadow of a serious felony conviction. He testified that "I know I done wrong." Clearly this record is sufficient to establish that he purposely went home for his gun and deliberately came back to the scene of the crime, after which he purposely fired several shots into the body of his victim until satisfied he had completely snuffed out his life. Such record is sufficient to show guilt independent of the plea of guilty. The transcript discloses that relator, as prisoner before the court, voluntarily gave evidence in open court against himself. It was his privilege to do so. Neither U. S. Const. Amend. XIV nor Minn. Const. art. 1, §§ 6, 7, deprives the court from hearing a voluntary confession in open court. A search of the entire record and proceedings herein fails to show prejudice to the rights of the accused whereby the court lost jurisdiction. On habeas corpus the judgment is presumptively

valid unless it appears affirmatively from the record that the court was without jurisdiction. The sentence being one imposed by a court of general jurisdiction, the writ reaches only those defects which appear on the face of the proceedings. Extrinsic evidence is not admissible to establish want of jurisdiction. State ex rel. Adams v. Rigg, 252 Minn. 283, 89 N. W. (2d) 898; State ex rel. Schwanke v. Utecht, 233 Minn. 434, 47 N. W. (2d) 99; Willoughby v. Utecht, 223 Minn. 572, 27 N. W. (2d) 779, 171 A. L. R. 535; State ex rel. DuFault v. Utecht, 220 Minn. 431, 19 N. W. (2d) 706, 161 A. L. R. 1316; 8 Dunnell, Dig. (3 ed.) § 4132.

Relator makes most of the fact that he was arraigned and entered his plea of guilty without the assistance of counsel. But the court told him that he could have an attorney or not, just as he liked—that it was up to him, and the record shows that he expressed the desire that he appear without counsel.

M. S. A. 630.10 provides that:

"If the defendant shall appear for arraignment without counsel, he shall be informed by the court that it is his right to have counsel before being arraigned, and shall be asked if he desires the aid of counsel."

■ Further provisions with reference to the appointment of counsel may be found in § 611.07. This court in considering the right of the accused to counsel, referring to § 630.10, said in State v. Martin, 223 Minn. 414, 417, 27 N. W. (2d) 158, 160:

"Even in a felony case, if accused is competent to defend himself adequately, he may waive his right to counsel and conduct his own defense. Dietz v. State, 149 Wis. 462, 136 N. W. 166, Ann. Cas. 1913C, 732. In 14 Am. Jur., Criminal Law, § 174, it is stated:

" '* * * However, a number of state courts have taken the view that the defendant's right to counsel is optional with him and that unless he claims his right and his request appears by the record to have been denied by the court, no invasion of his right to counsel is disclosed.'

"And in 23 C. J. S., Criminal Law, § 979, we find:

" 'It is a constitutional right of a person accused of crime to have the assistance of, and to be heard by, counsel in his defense; but he may, ordinarily, waive this right and conduct his own defense.'

"In 1 Cooley, Constitutional Limitations (8 ed.) p. 700, note 2, we find this statement:

" 'The right of counsel is permissive and conditional upon the pleasure of the accused. "Preferring the protection of the court or choosing to rely upon his own skill and ability, he may not desire the assistance of counsel." ' State v. Yoes, 67 W. Va. 546, 547, 68 S. E. 181, 140 A. S. R. 978."

In Carter v. Illinois, 329 U. S. 173, 67 S. Ct. 216, 91 L. ed. 172, the accused had pleaded guilty to a charge of murder without the assistance of counsel. Later he brought a petition for his release. He maintained that the conviction on which his confinement was based had been vitiated by the denial of his right under U. S. Const. Amend. XIV to the assistance of counsel. The Supreme Court of Illinois affirmed the original judgment of conviction in People v. Carter, 391 Ill. 594, 63 N. E. (2d) 763. On writ of certiorari the Supreme Court of the United States affirmed, and in doing so the court said (329 U. S. 174, 67 S. Ct. 218, 91 L. ed. 174):

"* * * Inherent in the notion of fairness is ample opportunity to meet an accusation. Under pertinent circumstances, the opportunity is ample only when an accused has the assistance of counsel for his defense. And the need for such assistance may exist at every stage of the prosecution, from arraignment to sentencing. This does not, however, mean that the accused may not make his own defense; nor does it prevent him from acknowledging guilt when fully advised of all its implications and capable of understanding them. Neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person the right to defend himself or to confess guilt. Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant. United States ex rel. McCann v. Adams."

■ It is well established in the law that except as limited by public policy a person may waive any legal right, constitutional or statutory. Martin v. Wolfson, 218 Minn. 557, 16 N. W. (2d) 884.

In regard to waiver of counsel, see Johnson v. Zerbst, 304 U. S. 458,

464, 58 S. Ct. 1019, 1023, 82 L. ed. 1461, 1466, 146 A. L. R. 357, 362, wherein the court said:

"* * * A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."

■ In Moore v. Michigan, 355 U. S. 155, 78 S. Ct. 191, 2 L. ed. (2d) 167, it was held that when an accused without counsel pleads guilty and later seeks release the burden rests upon him to establish that he did not competently and intelligently waive his right to assistance of counsel, citing Johnson v. Zerbst, *supra*. And in United States v. Morgan, 346 U. S. 502, 512, 74 S. Ct. 247, 253, 98 L. ed. 248, 257, the court said:

"* * * Of course, the absence of a showing of waiver from the record does not of itself invalidate the judgment. It is presumed the proceedings were correct and the burden rests on the accused to show otherwise."[1]

■ In Adams v. United States, 317 U. S. 269, 276, 63 S. Ct. 236, 240, 87 L. ed. 268, 273, 143 A. L. R. 435, 440, the court stated as follows:

"It hardly occurred to the framers of the original Constitution and of the Bill of Rights that an accused, acting in obedience to the dictates of self-interest or the promptings of conscience, should be prevented from surrendering his liberty by admitting his guilt. The Constitution does not compel an accused who admits his guilt to stand trial against his own wishes. Legislation apart, no social policy calls for the adoption by the courts of an inexorable rule that guilt must be determined only by trial and not by admission. A plea of guilt expresses the defendant's belief that his acts were proscribed by law and that he cannot successfully be defended. * * * The task of judging the competence of a particular accused cannot be escaped by announcing delusively simple

---

[1]See, State ex rel. Baker v. Utecht, 221 Minn. 145, 21 N. W. (2d) 328; Annotations, 149 A. L. R. 1403 and 146 A. L. R. 369.

rules of trial procedure which judges must mechanically follow. The question in each case is whether the accused was competent to exercise an intelligent, informed judgment—and for determination of this question it is of course relevant whether he had the advice of counsel. But it is quite another matter to suggest that the Constitution unqualifiedly deems an accused incompetent unless he does have the advice of counsel."

■ Counsel for relator quotes from State ex rel. Schwanke v. Utecht, 233 Minn. 434, 439, 47 N. W. (2d) 99, 102, the following:

"* * * It goes without saying that good practice not only requires that the court, before arraignment, inform the defendant, *in precise terms,* of his constitutional right to the assistance of counsel but that such informative action by the court *be made a matter of record."*

This statement derives from State v. McDonnell, 165 Minn. 423, 425, 206 N. W. 952, 953, where Mr. Justice Dibell, speaking for the court, commented upon the procedure followed in the court below where defendant, only 17 years of age, charged on two separate informations of having committed larceny in the first degree, was asked by the court:

"* * * Have you any attorney?
"The defendant: No, sir.
"The court: Do you wish to have one, or are you ready to enter a plea?
"The defendant: To plead.
"The court: What do you plead, guilty or not guilty?
"The defendant: Guilty, your honor."

The court in the McDonnell case made the following comment (165 Minn. 426, 206 N. W. 953):

"The statute was not followed formally. We feel that it is better that the court inform a defendant, in precise terms, that he is entitled to counsel, before arraignment, with such explanation as the particular case may suggest. The Constitution gives him the right 'to have the assistance of counsel in his defense.' Const. art. 1, § 6. And if by reason of poverty he cannot employ counsel the court appoints. G. S. 1923, § 9957.

"The omission to give the information does not go to the jurisdiction

of the court. It is at the most such a defect or irregularity as ought, in the proper administration of justice, to result in a vacation of the judgment with a right to change the plea. We are constrained to hold that the information given the defendant substantially conformed to that intended by the statute and that he cannot of right have the judgments vacated with leave to change his pleas.

\* \* \* \* \*

"\* \* \* An appellate court should appreciate the superior opportunity afforded the trial court for understanding the situation, and should be slow to hold that its discretion was not wisely exercised. The trial court may have thought that the defendant knew well the import of the proceedings and was dissatisfied only when leniency was not shown, and then desired to take a different course. We hold that there was no abuse of discretion."

The court below was affirmed in the McDonnell case.

Clearly the burden here is upon the relator to show not only a statutory violation, but also that such violation was so materially prejudicial as to deprive him of a fair trial, and further that the resulting error could not have been corrected by a timely exercise of an existing and available right of appeal.

It is elementary that habeas corpus may not be used as a substitute for a writ of error or appeal or as a cover for a collateral attack upon a judgment of a competent tribunal which had jurisdiction of the subject matter and of the person of the defendant. This principle applies even though defendant has permitted the time for appeal to elapse. State ex rel. Baker v. Utecht, 221 Minn. 145, 21 N. W. (2d) 328; Shaw v. Utecht, 232 Minn. 82, 43 N. W. (2d) 781, certiorari denied, 340 U. S. 855, 71 S. Ct. 73, 95 L. ed. 627; State v. Rudin, 153 Minn. 159, 189 N. W. 710; 25 Am. Jur., Habeas Corpus, § 41; 8 Dunnell, Dig. (3 ed.) § 4129.

It was made clear in the Schwanke case that the denial of certain constitutional rights—as well as certain statutory rights—where the right to due process of law is left unimpaired, is not fatal to the jurisdiction of the court and the error resulting from such denial is to be corrected through appeal and not by resorting to the extraordinary remedy of habeas corpus.

The sentencing court was not required to force counsel upon the accused in the instant case where he definitely expressed a desire not to have one. The purpose of the right to have the assistance of counsel is to protect the accused from a conviction resulting from his own ignorance of his legal and constitutional rights. These matters have been fully discussed recently in State ex rel. Thomas v. Rigg, 255 Minn. 227, 96 N. W. (2d) 252.

Relator at the time of argument before this court moved for leave to serve and file a traverse to respondent's writ herein. The motion comes too late. Since this court considers the matter de novo and will draw its own conclusions from the evidence, we have necessarily given consideration to the relator's testimony, the arguments, the briefs, and all the files and proceedings herein and draw our own conclusions therefrom, regardless of what the court below may have found.

We are bound to conclude from a full examination of the record presented and all the files and proceedings herein that the relator, in open court, voluntarily, understandingly, competently, and intelligently waived the benefit of counsel.

We reach the conclusion that the record in the instant case, together with the accompanying files and proceedings, amply supports findings and conclusions of the court below in denying the writ and remanding the custody of the relator to the respondent.

Affirmed.